Dennis O'NEILL, Plaintiff.

v.

Frederick B. DENT, Secretary of Commerce of the United States, et al., Defendants.

No. 71–C–1480.

United States District Court, E. D. New York.

July 16, 1973.

Kunstler, Kunstler & Hyman, New York City, for plaintiff; Steven J. Hyman, New York City, of counsel.

Robert A. Morse, U. S. Atty., E. D. N. Y., for defendants; George H. Weller, Asst. U. S. Atty., of counsel.

BARTELS, District Judge.

In this case we are presented with the serious question of whether the United States Merchant Marine Academy can constitutionally dismiss a cadet because he married in violation of Academy regulations and his agreement with the school. Constitutional issues being involved, it is clear that this Court has jurisdiction, see Wasson v. Trowbridge, 382 F.2d 807 (2d Cir. 1967); Krawez v. Stans, 306 F.Supp. 1230 (E.D.N.Y. 1969), and there is no doubt that such jurisdiction exists without the necessity of resorting to a three-judge court, since only an administrative regulation is attacked. See, *e. g.*, William Jameson & Co. v. Morgenthau, 307 U.S. 171, 59 S. Ct. 804, 83 L.Ed. 1189 (1939); Sardino v. Federal Reserve Bank of New York, 361 F.2d 106 (2d Cir. 1966).

Dennis O'Neill, a 26-year old midshipman, having completed two years of active duty in the United States Army, entered the United States Merchant Marine Academy in July, 1968. He would have graduated from the Academy in June of 1972 but he was dismissed on November 8, 1971 because it was discovered on November 3, 1971 that he married after he entered the Academy.

O'Neill's marriage on December 28, 1969, violated Midshipman Regulation 900.45 (1967),[1] U. S. Merchant Marine

---

[1] "If any midshipman shall be married prior to graduation he will be required to resign from the U. S. Merchant Marine Academy immediately."

Academy Regulation 02120 (July 1, 1971),[2] and 46 C.F.R. § 310.53(c),[3] prohibiting marriage of any cadet before final graduation, and also violated O'Neill's contract with the Government, dated April 26, 1968, in which he agreed to remain unmarried until completion of his training.[4] He kept his marriage secret until November 3, 1971, when it was revealed by an anonymous telephone call to the Academy. Upon his refusal to resign as requested by the Superintendent of the Academy, O'Neill was dismissed and the dismissal was upheld by the Maritime Administrator of the Department of Commerce. Thereupon O'Neill petitioned this Court for declaratory and injunctive relief, to void the Academy regulations as an unconstitutional restriction on his right to marry, and to order his reinstatement into the Academy. On November 12, 1971, this Court temporarily ordered O'Neill then in his final year at the Academy reinstated, and defendants subsequently consented to an extension of this temporary restraining order pending final resolution of this action. Pursuant to Rule 56(b), F.R.Civ.P., 28 U.S.C., the Government moved for summary judgment on the grounds that there was no genuine issue of material fact and that as a matter of law defendants were entitled to judgment. On May 31, 1972, the motion was denied and a hearing on plaintiff's motion for a preliminary injunction was consolidated with a trial on the merits for permanent injunction and declaratory judgment.[5]

2. "A midshipman who shall marry shall immediately submit his resignation. A midshipman found to be married and to have willfully concealed the fact will be dismissed." Midshipman Regulation 900.45 was in effect from O'Neill's entrance in 1968 until June 30, 1971. Regulation 02120 became effective July 1, 1971.

3. 46 C.F.R. § 310.53 is "General requirements for eligibility" and states in pertinent part:
"(c) *Marriage.* A candidate must be unmarried and have never been married. Any cadet who shall marry, or who shall be found to be married, or to have been married before his final graduation shall be required to resign. Refusal to resign will result in dismissal."

4. In pertinent part the contract reads as follows:
". . . Obligor agrees to remain unmarried until completion of the course of training at the United States Merchant Marine Academy, Kings Point, New York, or until termination of his appointment as a Midshipman, U.S.N.R."

5. The following material facts were without controversy:
(1) The Superintendent, United States Merchant Marine Academy, has the authority to issue Regulations for the United States Merchant Marine Academy, and the Midshipman Regulations of 1967 plus the U.S. Merchant Marine Academy Regulations of 1 July 1971 were issued under this authority.
(2) Plaintiff is a first classman (senior) at the Merchant Marine Academy.
(3) When nominated for the Academy, plaintiff signed Navy form NAVPERS 4135 on April 22, 1968 in which he obliged himself to remain unmarried while at the Academy.
(4) Plaintiff entered the Academy in July, 1968.
(5) Plaintiff was aware before he entered, when he entered, and throughout his stay at the Academy that he would be required to resign or be dismissed if he married.
(6) Plaintiff was aware of Midshipman Regulation 900.45 (1967) and U.S. Merchant Marine Academy Regulation 02120 (1 July 1971).
(7) Plaintiff and Donna Elizabeth Circkot were married on December 28, 1968 and they are still married.
(8) In the fall of 1971, on Navy pre-commissioning physical examination Forms and a Coast Guard license application, plaintiff listed his father as next of kin, and on one of the Navy forms when asked as to the state of health of spouse and children he left the answer spaces blank.
(9) Merchant Marine Academy administrators first became aware of plaintiff's marriage on November 3, 1971.
(10) Plaintiff, having earlier been dismissed by the Superintendent, was reinstated by order of this Court dated November 12, 1971.
(11) There has been a complete administrative due process procedure accorded plaintiff.
(12) On January 3, 1972, the Maritime Administrator upheld the Superintendent's November 30, 1971 order of dismissal which was based solely on plaintiff's marriage.

## I

Plaintiff attacks the regulations on many grounds, claiming that they encumber and improperly interfere with his fundamental right to marry in violation of the First, Fifth, and Fourteenth Amendments, and with his fundamental rights of privacy and association; that they deprive him of due process of law; that to the extent that they treat all married men as a class differently from all others similarly situated they deprive him of the equal protection of the laws; and finally, that the Government has failed to sustain its burden of establishing that the regulations "promote a compelling governmental interest," Shapiro v. Thompson, 394 U.S. 618, 634, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969), are necessary to promote that interest, Shapiro v. Thompson, *supra*, at 634, 89 S.Ct. 1322, and that there is no "reasonable [way] to achieve these goals with a lesser burden on constitutionally protected activity. . . ." Dunn v. Blumstein, 405 U.S. 330, 343, 92 S.Ct. 995, 1003, 31 L.Ed.2d 274 (1972). The Government counters with the assertion that the regulations must be granted a presumptive validity; that the only question for review is whether they bear some rational relation to any imaginable legitimate Academy purpose, see, *e. g.*, McGowan v. Maryland, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961); that there is, in fact, a rational connection between the regulations and a legitimate Academy purpose; that in judging this connection a more lenient standard of review must be adopted with respect to military regulations; and finally, that the plaintiff bears the burden of showing that the regulations bear no relevant relation to an Academy purpose. From these contentions two basic questions emerge: first, what is the standard of review the Court must apply to a "quasi-military regulation" which obviously encumbers the right to marry, and second, what factual connection, if any, exists between the regulation and the legitimate governmental objective of maintaining a proper academic and training program for midshipmen.

## II

The United States Supreme Court has made it abundantly clear that the right to marry underlies the purposes of the Constitution, although not mentioned therein, and is a fundamental right afforded protection by the First, Fifth, Ninth and Fourteenth Amendments of the United States Constitution. As far back as 1923 the Supreme Court recognized the right to marry as a liberty guaranteed by the due process clause of the Fourteenth Amendment.[6]  Meyer

---

(13) But for his marriage and actions related to his marriage, plaintiff has a satisfactory academic, conduct, and adaptability record.

6. The Government does not deny that the power to regulate marriage is a sovereign function retained by the States, and not vested in Congress. Loving v. Virginia, 388 U.S. at 7, 87 S.Ct. 1817; Maynard v. Hill, 125 U.S. 190, 8 S.Ct. 723, 31 L.Ed. 654 (1888). Thus, subject to constitutional limitations, the legislatures of the States are authorized to regulate the qualifications of the contracting parties, the forms or procedures necessary to solemnize the marriage, the various duties and obligations which it creates, and the procedures for dissolution. The States may properly enact reasonable regulations governing age, health, and competency.

Every American jurisdiction establishes an age for consent for marriage, the most common being eighteen for the male and sixteen for the female. Parental consent is frequently required where the male is under 21 and the female under 18, but these provisions are not generally mandatory. See, *e. g.*, H. Clark, Law of Domestic Relations (1968).

In New York State, for example, all persons who wish to marry must obtain a marriage license from a town or city clerk, and before a license will be issued each person first must furnish the clerk with a statement signed by a physician that he has been given a physical examination including a standard blood test designed to discover the presence of syphilis. New York Domestic Relations Law, § 13a, McKinney's Consol. Laws, c. 14.

In New York a marriage is voidable where a party has been incurably insane for a period of five years or more. New York Domestic Relations Law, § 141.

v. Nebraska, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923). In Skinner v. Oklahoma, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942), the right to marry was again recognized as a constitutional right. There the Supreme Court invalidated as violative of the equal protection clause of the Fourteenth Amendment an Oklahoma statute providing for the sterilization of habitual criminals. Writing for the Court, Mr. Justice Douglas noted that

> "We are dealing here with legislation which involves one of the basic civil rights of man. Marriage and procreation are fundamental to the very existence and survival of the race." 316 U.S. at 541, 62 S.Ct. at 1113.

In 1967, writing for a unanimous court Chief Justice Warren in Loving v. Virginia, 388 U.S. 1, 87 S.Ct. 1817, 18 L. Ed.2d 1010, struck down Virginia's anti-miscegenation statute as a violation of the Fourteenth Amendment due process and equal protection clauses, holding that

> "The freedom to marry has long been recognized as one of the vital personal rights essential to the orderly pursuit of happiness by free men." 388 U.S. at 12, 87 S.Ct. at 1824,

and that

> "Marriage is one of the 'basic civil rights of man,' fundamental to our very existence and survival." *Id.*

Likewise in Boddie v. Connecticut, 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971), the Supreme Court invalidated a Connecticut statute requiring the payment of a filing fee in order to bring an action for divorce. There Mr. Justice Harlan noted:

> "As this Court on more than one occasion has recognized, marriage involves interests of basic importance in our

society. See, *e. g.*, Loving v. Virginia, 388 U.S. 1, [87 S.Ct. 1817] 18 L.Ed.2d 1010 (1967); Skinner v. Oklahoma, 316 U.S. 535, [62 S.Ct. 1110] 86 L.Ed. 1655 (1942); Meyer v. Nebraska, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923)." 401 U.S. at 376, 91 S.Ct. at 785.

In a different context, Mr. Justice Goldberg concurring in Griswold v. Connecticut, 381 U.S. 479, at 495, 85 S.Ct. 1678, at 1688, 14 L.Ed.2d 510 (1965), observed:

> "The entire fabric of the Constitution and the purposes that clearly underlie its specific guarantees demonstrate that the rights to marital privacy and to marry and raise a family are of similar order and magnitude as the fundamental rights specifically protected."

See also United States v. Kras, 409 U.S. 434, 444, 93 S.Ct. 631, 34 L.Ed.2d 626 (1973) (*dicta*).

■ Turning to the regulation of student conduct in the context of marriage, it is relevant to recall that a student may not be expelled permanently from the public schools simply because of his marital status, without a factual showing of some misconduct or immorality, and without a clear and convincing demonstration that the welfare or discipline of the other pupils or the school is injuriously affected by the presence of married students. See, *e. g.*, McLeod, et al. v. State ex rel. Colmer, 154 Miss. 468, 122 So. 737 (1929);[7] Board of Education of Harrodsburg v. Bentley, 383 S. W.2d 677 (Ky.1964); Anderson v. Canyon Independent School District, 412 S. W.2d 387 (Tex.Civ.App.1967); Carrollton-Farmers Branch School District v. Knight, 418 S.W.2d 535 (Tex.Civ.App. 1967); *cf.* Tinker v. Des Moines Inde-

---

7. In striking down an ordinance barring married persons otherwise eligible, from public schools, the Mississippi Supreme Court noted: "Marriage is a domestic relation highly favored by the law. When the relation is entered into with correct motive, the effect on the husband and the wife is

refining and elevating rather than demoralizing . . . . And they [husband and wife] are as much subject to the rules of the school as unmarried pupils and punishable to the same extent for a breach of such rules." 122 So. at 738–739.

pendent School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). The fatal vice of these anti-marriage school regulations, courts have held, "lies in its sweeping, advance determination that every married student, regardless of the circumstances" must be expelled from the schools.[8] Board of Education of Harrodsburg v. Bentley, 383 S.W.2d at 680.

Although the Government concedes that the right to marry is both favored by public policy and premised on the Constitution, it argues that the above cases are inapposite because public schools are not governed by the same rigid disciplinary standards inherent in the military academies. It asserts that the opportunity to attend the Merchant Marine Academy is merely a privilege bestowed by the Government on cadets, and that the no-marriage rule is only a minor, partial or temporary restraint on a person's access to that privilege and consequently no denial of the fundamental right to marry. The corollary of such a contention is that absent a constitutional right to attend the Academy, O'Neill's access to the Academy may be conditioned upon a waiver of his right to marry during the school period. Similar contentions in one form or another have often been rejected by the Supreme Court in the past. The guiding principle was elucidated by Mr. Justice Stewart in Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), where he said:

"For at least a quarter century, this Court has made clear that even though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not act. It

may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech." 92 S.Ct. at 2697.

Again, in Dunn v. Blumstein, *supra*, the Supreme Court said:

" 'It has long been established that a State may not impose a penalty upon those who exercise a right guaranteed by the Constitution. . . . "Constitutional rights would be of little value if they could be . . . indirectly denied,". . . .' Harman v. Forssenius, 380 U.S. 528, 540 [85 S. Ct. 1177, 14 L.Ed.2d 50] (1965)." 405 U.S. at 341, 92 S.Ct. at 1002.

That the Government may not condition receipt of benefits upon the waiver—direct or otherwise—of constitutionally guaranteed liberties is no longer open to question. The effort to impose such conditions has been denied repeatedly with respect to the receipt of such benefits as public employment, United Public Workers v. Mitchell, 330 U.S. 75, 100, 67 S.Ct. 556, 91 L.Ed. 754 (1947); Wieman v. Updegraff, 344 U.S. 183, 192, 73 S.Ct. 215, 97 L.Ed. 216 (1952); Keyishian v. Board of Regents, 385 U.S. 589, 605–606, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967); Cafeteria & Restaurant Workers v. McElroy, 367 U.S. 886, 894, 81 S. Ct. 1743, 6 L.Ed.2d 1230 (1961); Pickering v. Board of Education, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), unemployment benefits, Sherbert v. Verner, 374 U.S. 398, 404–405, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), welfare payments, Shapiro v. Thompson, *supra*, 394 U.S. at 627, n. 6, 89 S.Ct. 1322; Graham v. Richardson, 403 U.S. 365, 374, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971), and finally, tax exemptions, Speiser v. Randall, 357 U.S. 513, 526, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958).

---

8. Marriage has been a basis, however, in some jurisdictions for discriminating between students as to the opportunity for participating in extracurricular activities. The case law is split on this question.

Compare Starkey v. Board of Education, 14 Utah 2d 227, 381 P.2d 718 (1963) with Davis v. Meek, et al., 344 F.Supp. 298 (D. Ohio 1972).

■ In short, the Academy regulations may not be upheld on the ground that they simply deny access to a mere privilege. More is involved; the Academy regulations penalize a cadet for exercising his right to marry. Not only do the regulations prevent a midshipman from marrying for four years, but they expressly bar all married men as a class from ever entering the Academy. Indeed, they go further and bar all those who, while no longer married, may have once been married.

### III

Accordingly, we are presented with a critical issue whether marriage substantially interferes with the performance and discipline of married cadets to the detriment of their performance at the Merchant Marine Academy. To determine the effect of marriage upon the disciplinary and academic objectives of the Academy, the Court held extensive evidentiary hearings, from which the following was unfolded:

### A

The United States Merchant Marine Academy was established by authorization of Congress in 1938, 46 U.S.C. § 1126, in order to train the officers of an expanding U.S. Merchant Marine, and may be identified as an institution existing somewhere between a purely civilian and a purely military institution, assuming characteristics of both. "Although the primary responsibility of the merchant marine is the transport of waterborne commerce, in times of need it acts as an auxiliary to the United States Navy and on graduation, a Cadet may receive a Reserve Commission in the Navy. Indeed, because of the vital national interest served by the merchant marine and the hazards which are commonly encountered, it accurately may be said that the responsibilities of merchant marine personnel are comparable to those of the Navy and Coast Guard." Wasson v. Trowbridge, 382 F.2d at 809.[9] While the Academy is operated by the Department of Commerce, it is run as a strict military institution.[10] Although the cadets are not subject to the Uniform Code of Military Justice, 10 U.S.C. § 801(7), 10 U.S.C. § 802(2), unlike cadets at the other National Service Academies, the standards of discipline, behavior and personal decorum at the Academy are comparable to those traditionally recognized as vital elements of a training program adopted by the other Armed Services Academies. It is a schedule calculated to develop the mind, body and character of prospective Academy graduates in order to insure an adequate supply of capable and dedicated officers for the U.S. Merchant Marine, the Navy and the Coast Guard. The

9. The Merchant Marine Academy Midshipman is also a Midshipman in the Naval Reserve. Indeed, a vital part of the Navy's support of the U.S. Merchant Marine begins with Navy participation in the training of midshipmen at the Academy. Candidates who are qualified in other respects for admission to the Academy must also meet all the requirements of Naval Reserve Midshipmen. Any candidate not qualified for Naval Midshipman status will not be appointed to the Academy. All Midshipmen are required to take a program of Naval science courses. And upon graduation a midshipman may be granted a commission as an Ensign in the Naval Reserve. He is obligated to accept the commission if offered. 46 C.F.R. § 310.63(c).

10. As Judge Moore noted in Wasson v. Trowbridge, 382 F.2d 807, at 809:
"The Regulations of the Academy themselves recite the basis for the prerequisite that Cadets conduct their affairs with a military bearing:
'The standards of discipline required by Academy Regulations must necessarily be high, since offenses which might be condoned in other walks of life cannot be tolerated aboard ships of the Merchant Marine or Navy where sins of omission or commission might cost human lives or millions of dollars worth of property. The Merchant Marine is run entirely by the discipline of the officers, by their standards, so their ships are run, and good discipline among all officers is paramount.' "

student body at the Academy is organized along military lines as a regiment consisting of three battalions. Midshipmen are eligible to enter the Academy between the ages of 17 and 22, and most are 17 or 18 years of age when admitted. The Academy will, however, permit veterans of the armed forces to enter up to the age of 24. Midshipmen receive substantial benefit from the Government in the nature of free tuition, board, allowances and other advantages, such as a commission in the Naval Reserve, and their appointments are awarded only after fierce competition.

The Academy offers a four-year undergraduate program leading to a Bachelor of Science degree and to a Merchant Marine license as a Third Mate or Third Assistant Engineer. The academic program actually compresses four years of work into three years because each midshipman during his stay at the Academy is also obligated to serve two tours, each approximately five months in duration, aboard American-flag merchant vessels. The institution accomplishes this objective by running an eleven-month academic year as opposed to the traditional 8½ or 9 month collegiate year. Midshipmen undergo intense training and rigid control virtually every hour of the day. Leave and liberty for midshipmen are regarded by the Academy as privileges rather than rights and they are subject to a priority for "watchstanding, discipline, inspection," and are generally of a short duration.[11] In sum, while the Academy, strictly speaking, is not a military institution subject to the terms and conditions of the Uniform Code of Military Justice, it is organized and operated along strictly military lines.

The U.S. Merchant Marine Academy Regulations prohibiting marriage dates back to the opening of an Academy in 1938.[12] The Academy apparently modeled the regulations upon similar prohibitions at the other National Academies. The very first federal academy marriage regulation was an order of the Secretary of War on March 31, 1835, which stated, in pertinent part, as to cadets at the U. S. Military Academy that "The marriage of a cadet vacates his position." Apparently there is no prior mention of marriage in the 1810, 1823 and 1832 U.S. Military Academy regulations. In each of the 19 sets of U.S. Military Academy regulations since 1835 there has been a requirement for dismissal if a cadet married. The other service academies, including the Naval Academy, the Coast Guard Academy and the Air Force Academy have similar prohibitions.[13]

---

11. Freshmen, or fourth classmen as they are known at the Academy, are usually not granted overnight liberties; second and first classmen are normally granted liberty from Saturday afternoon until Sunday evening each week.

12. General Order #23, amended, 3 F.R. § 667 (1938), stated in pertinent part that "the applicant must be an unmarried American citizen . . . ." General Order #28, F.R. § 3044 (1938) likewise stated that "Any cadet who shall marry or who shall be found to be married before completion of training shall be requested to resign, and, failing to do so, shall lose his status as a cadet."

13. The Naval Academy regulations prohibiting marriage date back to 1855. Regulations of Naval Academy 1855, Ch. 111, "Discipline: '27. If any student shall be found to be married, or shall marry while attached to the Academy, his marriage will be considered sufficient to dissolve his connection with the Academy, and to authorize his name to be dropped forthwith from the Navy List.'" The Coast Guard Academy marriage-dismissal regulations date back at least as far as the "Rules and Regulations governing the course of instruction on the practice ship 'Chase' (1897) for Revenue Cutter Service cadets, which stated at Article 31: 'The marriage of a cadet shall be considered as equivalent to his resignation.'" Five of the six state maritime academies also have similar prohibitions against married cadets.

All of the Academies, including the Merchant Marine Academy, not only bar a cadet from entering or remaining if married, but also bar any applicant if he ever had been married.

## B

In support of the necessity of the regulations, the Government offered the opinions of experts in the field, such as Captain Paul Krinsky, Director of Admissions, Merchant Marine Academy; Captain Malcolm Williams, Director of Admissions, United States Coast Guard Academy; Admiral Arthur Engel, Superintendent of the Merchant Marine Academy; Captain Victor Tyson, Assistant Superintendent of the Academy; Dr. Walter Gunn, Assistant Academic Dean at the Academy; and Captain Edward Knudsen, Commandant of Midshipmen at the Academy. All of these witnesses offered the opinion that the obligations of a husband coupled with the responsibilities of complying with the unusually stiff academic and training regime at the Academy, would definitely interfere with the cadet's performance and record at the Academy. They averred that the program was very time-consuming; that the Academy is a very structured environment vastly different from the normal college or university atmosphere; that married men would be subject to greater stress than single men; that these stresses would be compounded because the cadet would be obligated to reside at the Academy, away from his spouse, and because his financial resources would generally be meager; in a word, that married men would be incapable or less capable of coping with the structured environment than single men, and hence their performances would be poorer. Moreover, they suggested that the attrition rate at the Academy would rise, and administrative problems would be compounded if the no-marriage rules were changed. Some of the Government witnesses conceded that older and more mature cadets in the upper classes would be more capable of adjusting to the Academy environment, if married, than the younger cadets. But all strongly opined that an absolute prohibition against marriage, regardless of age and circumstance, was necessary in order to achieve the lawful objects of the Academy.

While the Government witnesses did concede that the reasons for cadet attrition are many, varied and complex, including medical reasons, incapacity to adapt to a military environment, academic problems and a change in career goals, it was their experience that this attrition rate would sharply rise if marriage were permitted because married cadets would necessarily render a poorer performance. To buttress this argument, they point out that teenage marriages carry with them an exceptionally high risk of divorce, which in turn would increase the number of dropouts. The statistical evidence made available to us substantiates the assertion that, all other things being equal, teenage marriages have a higher propensity to end up in divorce than marriages of older persons; but it also reveals that the statistical propensity to divorce drops sharply for men and women who marry at the age of twenty or older. For example, a survey conducted by the United States Bureau of the Census indicates that the probability of divorce in the first two years of a first marriage is considerably higher than the average (1.3% per year or 13/1000) for men who marry when they are less than 20 years of age (2.2% per year or 22/1000); but the survey further indicates that the rate of divorce is slightly less than average for men who marry between the ages of 20 and 24 (1.2% per year or 12/1000). While the probability of divorce is lowest apparently among men who marry between the ages of 25 and 29 (0.7% per year or 7/1000), the probability increases among older men and the probability is the same for the 20–24 group as

the above 30 group.[14] From these statistics it appears that even if we were to completely accept the attrition argument based upon divorce, the Academy could minimize attrition by narrowly tailoring its regulations to the teenage cadet. But the Academy goes further and denies admission to anyone who has ever been married even though he may have been divorced or widowed at the time of his application. How such an applicant would in any way be subject to the purported stress which is said to inhere in the marriage relationship is difficult to understand. In this respect the regulation suffers from overbreadth barring every past or presently married student, regardless of age, maturity or circumstance.

The Academy additionally maintains that a change in the no-marriage rules would compound administrative problems. This is predicated upon the unproven assumption that a change in the rules will result in a flood of new marriages. As will be shown later, this claim is an insufficient justification.

C

In his behalf plaintiff, Dennis O'Neill, offered the testimony of certain witnesses, including himself and his wife Donna. He also produced the testimony of Roy Luebbe, Director of the Calhoun MEBA Engineering School, a private maritime academy; John Brodar, a married midshipman who managed to graduate from the Merchant Marine Academy without being discovered; Professor Pyros, an instructor of computer science at the Academy; Commander Walter Meyers, a regimental officer at the Academy; and Captain Robert Wall, a commandant of midshipmen at the Academy for a short time. Both O'Neill and Brodar testified that marriage was not a barrier to successful performance at the Academy, but rather, in their cases, was a significant advantage to the cadet; that they strictly followed all other rules and regulations at the Academy; that they visited their wives only on prescribed liberty hours; and that they knew of other married cadets who successfully graduated from the Academy without detection. Roy Luebbe testified that the Calhoun MEBA Engineering School was a private technical school offering two and three year marine engineering courses leading to a third-class marine engineering license. The Calhoun School has no prohibition against married students. Luebbe averred that marriage was not an impediment to successful performance and that he had personally observed many married men with greater motivational drive than single men. Commander Meyers testified that O'Neill's conduct performance was excellent; that he had never known of O'Neill's marriage until O'Neill was discharged; and that in his opinion O'Neill's marriage in no way interfered with his performance. Professor Pyros testified that O'Neill was an exceptional student in computer science; that he had observed no relationship between marriage and academic performance;

14. Average Annual Probabilities of Divorce in First Marriage for Men Under 70 Years Old—United States—All Races—1960–1968

| Age at First Marriage | Probability of Divorce | |
|---|---|---|
| | 1st and 2nd Year of Marriage | 3rd & 5th Year of Marriage |
| Less than 20 years old | 22/1000 | 21/1000 |
| 20–24 | 12/1000 | 16/1000 |
| 25–29 | 7/1000 | 7/1000 |
| 30–69 | 12/1000 | 12/1000 |
| All Ages | 13/1000 | 14/1000 |

These figures are an extract from Table 4, U. S. Bureau of the Census, Current Population Reports, Series P–20, No. 223, "Social and Economic Variations in Marriage, Divorce and Remarriage: 1967", U. S. Govt. Printing Office, Washington, D. C. 1971, at 22.

and that he had ample opportunity to compare performances because he had taught the same computer science course at New York University to both married and single students. Finally, Captain Wall testified that in his opinion, based on observation of many cadets, marriage would not interfere with student performance; that he did not believe marriage adds "stress" to a student's performance; and that the very fact that a number of married cadets managed to graduate undetected each year refutes the assertion that a change in the no-marriage rule would have an adverse impact on the Academy.

### D

In addition to the above, the Court considered certain data examining the relationship of the marital status of college students to academic achievement. These studies indicate that married students generally perform no worse than their single colleagues. Marshall and King report, for example, in a major study in 1966 drawn from large state-supported universities in the Midwest and West that married students appear to be somewhat older than unmarried students; that there are no discernible differences in grade point averages of married students as compared with unmarried students; that married male students are more apt to come from families of lower socio-economic status than unmarried male students; that married students have larger debts to be repaid; that their major source of income is employment of wife and husband; that they have less leisure time; and that married men aspire to higher future goals. Marshall and King, Undergraduate Student Marriage: A Compilation of Research Findings, 28 Journal of Marriage and the Family, 350 (1966).

Another researcher concluded that married students were more successful in achieving a higher grade point average than unmarried students. Rus-

so, Predicting Academic Achievement of Students in Arizona Junior Colleges, 30 Dissertation Abstracts International 2309A (1969). A third researcher noted that a male's grade point average at the University of Nebraska Teacher's College went up during the semester after marriage, except for business administration and engineering majors. Wilder, Relationship of College Achievement to Marital Status, 27 Dissertation Abstracts 3326–27 (1967). Horner concluded that marriage made no difference between "persisters" and "non-persisters." Horner, An Analysis of Persisters and Non-Persisters at the University of Nebraska, 30 Dissertation Abstracts International 850A (1970). But Watley found that single non-black men got better freshman grades than non-black men who married. Watley, Black and Non-Black Youth: Does Marriage Hinder College Attendance? 7 National Merit Scholarship Corporation Reports #5, at 19, 25 (1971).

The analogy to married college students, however, is imperfect because the military environment is vastly different. Accordingly, the Court requested both the plaintiff and the Government to compile a list of all known married cadets who attended the U. S. Merchant Marine Academy, or the U. S. Military Academy, or the U. S. Naval Academy, or the U. S. Coast Guard Academy, or the U. S. Air Force Academy. A list of 27 cadets and their academic and conduct records was compiled: eight cadets at the U. S. Merchant Marine Academy; six at the U. S. Military Academy; three at the U. S. Coast Guard Academy; and ten at the U. S. Naval Academy.[15] While the sample is manifestly too small and wholly inadequate to be representative, an examination of the academic and conduct performance of these cadets, who married at various points during their years at the service academies, fails to reveal any correlation between marriage and cadet perform-

---

15. Appended is a summary of the academic and conduct performance of the 27 cadets,

which has been stipulated by both plaintiff and defendants to be accurate.

ance. The performance of some cadets improved after marriage; others remained essentially the same both before and after the date of marriage; still others slightly declined after marriage. Moreover, these cadets ranged the spectrum from very fine students to just barely passing students.

The Court also requested the U. S. Attorney to compile a list of comparable no-marriage regulations at the academies of foreign countries, with sizable armed forces, again fully aware that analogies are hazardous at best, and perhaps wholly irrelevant where differences may turn on national or cultural variations. Nevertheless, an examination of regulations of military academies of foreign nations with some of the largest armed forces and navies in the world, generally fails to reveal similar no-marriage regulations. Norway, the United Kingdom, Japan, Nationalist China, and West Germany apparently have no marriage regulations whatsoever. The French Merchant Marine Academy, a four-year school program coupled with a five-year program at sea, has no restraint on marriage for entrants or cadets. The other French academies, with two-year training programs, require an entrant to be single, but permit a student to marry in the second year, and "in a delicate situation" in the first year. The Italian Merchant Marine Academy, a four-year program, also has no restrictions at all on entrants or students. The other Italian academies apparently bar career officer candidates from marrying until they complete four years of training and reach 25 years of age. In passing, we also note that Army, Navy, and Air Force ROTC programs permit the students to marry or be married.[16]

## IV

To resolve this serious issue the Court must first determine what standard of review is applicable to the evidence adduced. In doing so, we are reminded that "The military has always occupied a special position and courts have been reluctant to interfere or take over the job of 'running the army.' Orloff v. Willoughby, 345 U.S. 83, 93 [73 S.Ct. 534, 97 L.Ed. 842] (1953)." Robinson v. Rand, 340 F.Supp. 37, 38 (D. Colo.1972). Consequently, military institutions are allowed a certain amount of latitude of discretion in order to properly discipline and train their members. See, e. g., Cortright v. Resor, 447 F.2d 245 (2d Cir. 1971); Raderman v. Kaine, 411 F.2d 1102 (2d Cir. 1969). In Anderson v. Laird, 151 U.S.App.D.C. 112, 466 F.2d 283 (1972), involving a violation of the Establishment Clause of the First Amendment, Chief Judge Bazelon stated:

> "Personal freedoms of conduct and appearance have been accommodated to the military's perceived need to establish procedures best suited to regulate its day-to-day operations, daily assignments and call-up orders; to determine a reservist's discharge of his duties; to regulate physical appearance; and to ascertain 'the essential characteristics of fitness for duty.' This deference to military decision making has been justified by the military's role, its mandate to prepare for the waging of war, and the necessity of this mandate for our national security. However, deference has inherent limitations which have also been fully recognized in judicial decision." 466 F.2d at 294–295.

The Court must decide whether this deference to military decision is overcome by the absence of any rational and reasonable relation of the regulations to legitimate military objectives. Nixon v. Secretary of Navy, 422 F.2d 934 (2d Cir. 1970); Raderman v. Kaine, *supra*; Dash v. Commanding General, 307 F. Supp. 849 (D.S.C.1969), aff'd, 429 F.2d 427 (4th Cir. 1970), cert. denied, 401 U. S. 981, 91 S.Ct. 1192, 28 L.Ed.2d 333

---

16. Neither 32 C.F.R. §§ 652.21–662.24 nor 32 C.F.R. §§ 370.16–370.20 make any mention of marriage.

(1971). When the military promulgates a regulation which collides with individual rights of its members protected by the Constitution, the court must determine whether on balance the interests of the Government justify its survival or whether it must yield to the rights of the individual. In the past the federal courts have reviewed and invalidated various military orders which interfered with constitutional rights, mainly First Amendment expressional activities, Dash v. Commanding General, *supra*; procedural due process violations in court martial proceedings, Burns v. Wilson, 346 U.S. 137, 73 S.Ct. 1045, 97 L.Ed. 1508 (1953); administrative discharges in violation of regulations, Harmon v. Brucker, 355 U.S. 579, 78 S.Ct. 433, 2 L.Ed.2d 503 (1958); Schwartz v. Covington, 341 F.2d 537 (9th Cir. 1965); and service related conscientious objector claims, United States ex rel. Sheldon v. O'Malley, 137 U.S.App.D.C. 141, 420 F.2d 1344 (1969).

Plaintiff premises his complaint upon a purported violation of his constitutional equal protection rights. With this in mind, the Court notes that recently the Supreme Court has developed a so-called "two-tiered" approach to the Fourteenth Amendment equal protection clause, one known as the "strict scrutiny" or the "compelling state interest" test, and the other known as the "minimal scrutiny" or "rational relationship" test. The "strict scrutiny" test is applied when rights properly classified as "fundamental," such as the right to travel, Shapiro v. Thompson, *supra*, the right to vote, Dunn v. Blumstein, *supra*; Harper v. Virginia Board of Elections, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966), and the right to essential facilities for prosecution of a criminal appeal, Griffin v. Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956), are involved; or when the classification is predicated upon certain "suspect" classifications, such as race, Loving v. Virginia, *supra*, alienage, Graham v. Richard-son, *supra*, and national origin, Hernandez v. Texas, 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954); Oyama v. California, 332 U.S. 633, 68 S.Ct. 269, 92 L.Ed. 249 (1948). On the other hand, if neither a fundamental right nor a suspect classification is involved, the statute or regulation is presumptively valid and will not be disturbed unless without a reasonable relation to a valid state purpose. In McGowan v. Maryland, 366 U.S. at 426, 81 S.Ct. at 1105, Chief Justice Warren enunciated the "minimal scrutiny" test in these words: "A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it." Mr. Justice Frankfurter in a concurring opinion observed: "Neither the Due Process nor the Equal Protection Clause demands logical tidiness. Metropolis Theatre Co. v. City of Chicago, 228 U.S. 61, [33 S. Ct. 441, 57 L.Ed. 730]. No finicky or exact conformity to abstract correlation is required of legislation. The Constitution is satisfied if a legislature responds to the practical living facts with which it deals." 366 U.S. at 524, 81 S.Ct. at 1188.

Although the Supreme Court has hesitated to expand the list of fundamental rights, Lindsey v. Normet, 405 U.S. 56, 92 S.Ct. 862, 31 L.Ed.2d 36 (1972) (Court rejected the contention that the right to housing is "fundamental"), Jefferson v. Hackney, 406 U.S. 535, 92 S.Ct. 1724, 32 L.Ed.2d 285 (1972); Richardson v. Belcher, 404 U.S. 78, 92 S. Ct. 254, 30 L.Ed.2d 231 (1971); Dandridge v. Williams, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970) (Court rejected the contention that welfare is "fundamental"), it has repeatedly held the right to marry to be fundamental.[17] Recently the Supreme Court has moved away from a rigid dichotomy between the "compelling state interest" test and the "minimal scrutiny" test, adopting, at least in some cases, "a more flexible and equitable approach, which permits consideration to be given to evidence of the

---

17. See discussion, *supra*, at pp 5–11.

nature of the unequal classification under attack, the nature of the rights adversely affected, and the governmental interest urged in support of it. Under this approach the test for application of the Equal Protection Clause is whether the legislative classification is *in fact* substantially related to the object of the statute." Boraas, et al. v. Village of Belle Terre, et al., 476 F.2d 806, 814 (2d Cir. 1973). Perhaps the clearest exposition of this approach is found in Reed v. Reed, 404 U.S. 71, 92 S.Ct. 251, 30 L. Ed.2d 225 (1971), where Chief Justice Burger stated for a unanimous Court that

> "A classification 'must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike.' Royster Guano Co. v. Virginia, 253 U.S. 412, 415 [40 S.Ct. 560, 64 L.Ed. 989] (1920). The question presented by this case, then, is whether a difference in the sex of competing applicants for letters of administration bears a rational relationship to a state objective that is sought to be advanced. . . . The crucial question, however, is whether § 15–314 advances that objective in a manner consistent with the command of the Equal Protection Clause. We hold that it does not." 404 U.S. at 76, 92 S.Ct. at 254.

See also Eisenstadt v. Baird, 405 U.S. 438, 446–455, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972); James v. Strange, 407 U.S. 128, 140–141, 92 S.Ct. 2027, 32 L.Ed.2d 600 (1972); Jackson v. Indiana, 406 U. S. 715, 723–730, 92 S.Ct. 1845, 32 L.Ed. 2d 435 (1972); Weber v. Aetna Cas. & Sur. Co., 406 U.S. 164, 172–176, 92 S.Ct. 1400, 31 L.Ed.2d 768 (1972); Green v. Waterford Board of Education, et al., 473 F.2d 629 (2d Cir. 1973); City of New York, et al. v. Richardson, et al., 473 F.2d 923 (2d Cir. 1973); Gunther, The Supreme Court, 1971 Term, Foreword: In Search of Evolving Doctrine on a Changing Court: A Model for a

Newer Equal Protection, 86 Harv. L. Rev. 1 (1972); Note, Legislative Purpose, Rationality and Equal Protection, 82 Yale L.J. 123 (1972). Under this approach courts are constrained to examine the actual empirical relationship between the classification and its lawful object "rather than accept one hypothetical legislative justification to the exclusion of others . . ." Boraas, et al. v. Village of Belle Terre, et al., *supra*, 476 F.2d at 815, and also to determine whether there is a less restrictive way to achieve these goals.

Here the Court is not faced with a violation of the equal protection clause of the Fourteenth Amendment but with a violation of the due process clause of the Fifth Amendment, which contains no express equal protection right. Although this Court has no instruction that the same spectrum of tests applicable to equal protection clause violations will also be applied in measuring due process clause violations, it is cognizant of the fact that the Supreme Court has frequently held that the Fifth Amendment "does forbid discrimination that is 'so unjustifiable as to be violative of due process.'" Schneider v. Rusk, 377 U.S. 163, 168, 84 S.Ct. 1187, 1190, 12 L.Ed.2d 218 (1964); Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954); Shapiro v. Thompson, *supra*, 394 U.S. at 641–642, 89 S.Ct. 1322, 22 L.Ed.2d 600; Frontiero v. Richardson, 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973).

Thus there are three tests which are conceivably applicable to the facts of this case: (1) the "strict scrutiny" test (Shapiro v. Thompson, *supra*), (2) the "substantial relation" test (Reed v. Reed, *supra*), and (3) the "minimal scrutiny" test (McGowan v. Maryland, *supra*). While the Supreme Court has raised a question whether the variable standards employed in reviewing violations of the equal protection clause will be read into the due process clause, see Vlandis v. Kline, 412 U.S. 441, 93 S.Ct. 2230, 37 L.Ed.2d 63 (1973), the Court nevertheless has applied the "strict scrutiny" test in determining

whether a certain legislative classification violated due process. Frontiero v. Richardson, *supra*. If this Court applies the "strict scrutiny" test, the burden is placed upon the Academy to demonstrate that the regulations are necessary to promote a compelling governmental interest and that there is no reasonable way to achieve these goals with a lesser burden on this constitutionally protected activity. In view of the fundamental nature of the right, the Court has no alternative but to apply the "strict scrutiny" test and to require the Government to demonstrate a compelling necessity for the regulations.

■ In Anderson v. Laird, *supra*, a stronger case involving the First Amendment, Judge Leventhal in a concurring opinion aptly framed the issue now before this Court in another context:

> "The question arises whether the government's use of a practice that bears a religious impress is saved from unconstitutionality because of an overriding state interest in effective training of its military officers. That is the nub of this case, as I see it.
>
> For the government to invoke this possibility of justification it must show the clearest kind of imperative, and lack of alternative, for the 'government may not employ religious means to serve secular interests, however legitimate they may be, at least without the clearest demonstration that nonreligious means will not suffice.'" 466 F.2d at 302.

The Court does not question the fact that the judgment of military leaders who are charged with the responsibility of training future officers for our Merchant Marine is entitled to great weight. As Mr. Justice Harlan stated in Noyd v. Bond, 395 U.S. 683, 694, 89 S.Ct. 1876, 1883, 23 L.Ed.2d 631 (1969):

> "In reviewing military decisions, we must accommodate the demands of individual rights and the social order in a context which is far removed from those which we encounter in the ordinary run of civilian litigation, whether state or federal."

With the military necessities of the Academy in mind, the Court nevertheless is compelled to conclude that the opinions and judgments of the Academy officials have failed to demonstrate "the clearest kind of imperative" for interference with the cadet's right to marry as required by the "strict scrutiny" test.

■ Nor does the Court believe that the military opinions and evidence adduced were sufficient to satisfy the more lenient equal protection standard resting upon "a fair and substantial relation to the object of the legislation." Royster Guano Co. v. Virginia, 253 U.S. 412, 415, 40 S.Ct. 560, 561, 64 L.Ed. 989 (1920); Reed v. Reed, *supra*. Only if we apply the *McGowan* minimal standard of judicial review will the regulations pass constitutional muster. The Court does not find the regulations arbitrary and it could subscribe to the opinions of the Academy officials that, all other things being equal, unmarried students would have less responsibility than married students and it therefore could hypothesize a relationship between the performance of married cadets and the demands of the Academy. But measured by the "strict scrutiny" test or the "substantial relation" test, the Court finds no concrete evidence which factually relates the marriage prohibition to the academic and disciplinary necessities of the Academy or the performance of its cadets. Additionally, the Academy has failed to demonstrate that there is no other reasonable way to achieve its goals with a lesser burden on this constitutionally protected activity. The fatal vice of the regulations is the sweeping, advance determination that every married student, regardless of age, maturity or circumstance, cannot be accepted or if unwittingly accepted, must be expelled from the Academy simply because he is married. The conclusive presumption that all married cadets will perform more poorly than single cadets cannot be accepted upon the record before the Court. Nor is the Government

saved under this test by a claim of administrative inconvenience. As stated by Mr. Justice Brennan in Frontiero v. Richardson, *supra*,[18] 93 S.Ct. at 1772, if "we enter the realm of 'strict judicial scrutiny,' there can be no doubt that 'administrative convenience' is not a shibboleth, the mere recitation of which dictates constitutionality." See also Shapiro v. Thompson, *supra*; Carrington v. Rash, 380 U.S. 89, 85 S.Ct. 775, 13 L. Ed.2d 675 (1965). Nor can the Government by contract require a cadet to surrender his constitutional right to marry. See, *e. g.*, United States v. Marchetti, 466 F.2d 1309, 1313, 1317 (4th Cir. 1972), cert. denied, 409 U.S. 1063, 93 S. Ct. 553, 34 L.Ed.2d 516 (1972).

Finally, the testimony of the Academy officials indicates a pronounced fear that they would be obligated to change a program properly calculated to develop the mind, body and character of prospective officers. Nothing in this opinion requires such a change. Nor is the Court called upon to decide whether a less sweeping regulation would be constitutionally acceptable, or whether a regulation predicated upon additional data or evidence showing a substantial difference between the performance of married and unmarried cadets would be invalidated. The Court decides only that no such data or evidence has been adduced in this case. Accordingly, the Court concludes that Academy Regulation 02120, Midshipman Regulation 900.-45, and 46 C.F.R. § 310.53(c) violate the First and Fifth Amendments of the Constitution, and it hereby orders the U. S. Merchant Marine Academy to award a diploma to Midshipman Dennis O'Neill within thirty (30) days from the date of the filing of this opinion.

So ordered.

## Appendix

UNITED STATES MERCHANT MARINE ACADEMY

| Name | Date of Birth | Date of Entry | Date of Graduation | Date of Marriage | Academic Record: Year | Average | Class Standing | Cumulative aver. |
|---|---|---|---|---|---|---|---|---|
| FRED D. ANDERSON | March 29,1949 | July 1967 | June 1972 | Dec.20,1970 | 1st: 1967-68 | C+ | 117/277 | |
| | | | | | 2nd: July 68-69 (while Mr. Anderson completed his 2nd yr., he was set back, at his own request) | | | |
| | | | | | (2nd: July 69-70 | | | |
| | | | | | (3rd: July 70-71 | B | 111/216 | |
| | | | | | (satisfactorily completed year at sea) | | | |
| | | | | | 4th: July 71-72 | B | 114/210 | B |

CONDUCT RECORD: essentially a B average with fluctuations throughout his four years, both before and after his marriage.

EXTRA-CURRICULAR ACTIVITIES: Editor-in-Chief of the Yearbook
Midshipman Officer, rank of Commander, for the year 1971
Member Rifle Team 71-72
Participated in variety of varsity athletics

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| * JOHN BRODAR | Aug.28,1950 | July 1968 | June 1972 | Nov.1971 | 1st: July 68-June 69 | C | 197/259 | |
| | | | | | (2nd: July 69-June 70 | C+ | 182/216 | |
| | | | | | (3rd: July 70-June 71 | | | |
| | | | | | (Satisfactorily completed year at sea) | | | |
| | | | | | 4th: July 71-June 72 | C+ | 176/210 | C+ |

NOTE: Mr. Brodar was on probation prior to his marriage. After changing his course of study from a dual license program to a single license program, and after being married, his record improved sufficiently so that he was removed from probationary status and was graduated with his class.

CONDUCT: Mr. Brodar's conduct was exemplary throughout his four years at the Academy.

* Mr. Brodar testified at trial. The Court is therefore referred to his oral testimony in addition to his transcript record.

18. In *Frontiero* the Supreme Court held that a statutory scheme which treated a service woman differently from a serviceman insofar as either might claim a spouse as a "dependent" unconstitutionally discriminated against women in violation of the Due Process Clause of the Fifth Amendment.

UNITED STATES MERCHANT MARINE ACADEMY

Page 2

| Name | Date of Birth | Date of Entry | Date of Graduation | Date of Marriage | Academic Record: Year | Average | Class Standing | Cumulative average |
|------|------|------|------|------|------|------|------|------|
| DAVID FICKEN | Oct.11,1938 | Sept.1956 | Withdrew Feb. 11,1960 | June 6,1959 | 1st: Sept.56-57 | C+ | 138/241 | |
| | | | | | (2nd: 57-58 | C+ | 101/174 | |
| | | | | | (3rd: 58-59 | | | |
| | | | | | (satisfactorily completed year at sea) | | | |
| | | | | | 4th:July 59-60   C- for first two semesters Mr. Ficken resigned due to his marriage prior to completing the last two semesters of his senior year. | | | |

CONDUCT: unknown

| Name | Date of Birth | Date of Entry | Date of Graduation | Date of Marriage | Academic Record: Year | Average | Class Standing | Cumulative average |
|------|------|------|------|------|------|------|------|------|
| JOHN JURGENS | Oct.9,1950 | July 1968 | June 1972 | Jan.1972 | 1st: July 68-69 | B- | 77/257 | |
| | | | | | (2nd: July 69-70 | B- | 114/213 | |
| | | | | | (3rd: July 70-71 | | | |
| | | | | | (satisfactorily completed year at sea) | | | |
| | | | | | 4th: July 71 - June 72 | B | 100/210 | B |

CONDUCT: consistent throughout his first three years,
fluctuating between A and B rating; for the
first two semesters of his senior year, July
1971-December 1971, was given an F for conduct;
thereafter, for remaining two semesters his
conduct rating returned to the A and B level.

EXTRA-CURRICULAR
ACTIVITIES:   Member of the Band for the four years.

UNITED STATES MERCHANT MARINE ACADEMY

page 3

| Name | Date of Birth | Date of Entry | Date of Graduation | Date of Marriage | Academic Record: Year | Average | Class Standing | Cumulative average |
|------|------|------|------|------|------|------|------|------|
| JOHN KOSKI | May 20,1949 | July 1968 | June 1972 | July 1971 | 1st: July 68-69 | B- | 60/257 | |
| | | | | | (2nd:July 69-70 | B- | 96/213 | |
| | | | | | (3rd:July 70-71 | | | |
| | | | | | (satisfactorily completed year at sea) | | | |
| | | | | | 4th:July 71-72 | B- | 98/210 | B- |

CONDUCT: maintained exemplary conduct throughout.

EXTRA-CURRICULAR
ACTIVITY:   Mr. Koski held a Midshipman Officer position in the
Cadet Regiment for his last two years, going from
Platoon Commander to Executive Officer for his last
year.

Member of the Glee Club throughout.

| Name | Date of Birth | Date of Entry | Date of Graduation | Date of Marriage | Academic Record: Year | Average | Class Standing | Cumulative average |
|------|------|------|------|------|------|------|------|------|
| BARRY MALLOW | June 10,1947 | July 68 | June 1972 | July 24,1971 | 1st: July 68-69 | B- | 72/257 | |
| | | | | | (2nd:July 69-70 | C | 180/213 | |
| | | | | | (3rd:July 70-71 | | | |
| | | | | | (satisfactorily completed year at sea) | | | |
| | | | | | 4th: July 71-72 | C+ | 151/210 | C+ |

NOTE: Mr. Mallow received two awards at graduation.

CONDUCT: fluctuated throughout except in his senior year, July 71-
72, he had all A's.
Mr. Mallow held Midshipman rank his last two years and
in his senior year went from Company Commander to
Battalion Commander in the Cadet Regiment.

UNITED STATES MERCHANT MARINE ACADEMY

4.

| Name | Date of Birth | Date of Entry | Date of Graduation | Date of Marriage | Academic Record: Year | Average | Class Standing | Cumula- tive average. |
|------|---------------|---------------|--------------------|--------------------|----------------------|---------|----------------|----------------------|
| *DENNIS O'NEILL | March 28,1947 | July 1968 | Finished course of study June 1972 | Dec. 1968 | 1st:July 68- June 69 | C‡ | 176/256 | |
| | | | | | (2nd:July 69- June 70 | C | 169/216 | |
| | | | | | (3rd:July 70- June 71 | | | |
| | | | | | (satisfactorily completed year at sea) | | | |
| | | | | | 4th: July 71- June 72 | C‡ | -------- | |

NOTE: Mr. O'Neill was taking a dual license course of study.

CONDUCT: An A student for most of his years at the Academy.

EXTRA-CURRICULAR: A Cadet Officer; Glee Club cheerleader.

*Mr. O'Neill testified at trial and others testified with regard to his conduct. The Court is referred to the oral testimony adduced at trial.

| Name | Date of Birth | Date of Entry | Date of Graduation | Date of Marriage | Academic Record: Year | Average | Class Standing | Cumula- tive average. |
|------|---------------|---------------|--------------------|--------------------|----------------------|---------|----------------|----------------------|
| MICHAEL WISE | Aug.2,1949 | July 1967 | June 1971 | Mar.31,'69 | 1st: July 67-68 | C‡ | 191/277 | |
| | | | | | (2nd:July 68- June 69 | C | 179/224 | |
| | | | | | (3rd:July 69-70 | | | |
| | | | | | (satisfactorily completed year at sea) | | | |
| | | | | | 4th: July 1970- '71 | C‡ | 169/211 | C‡ |

CONDUCT: Mr. Wise had satisfactory conduct for his first year, ('7-68); thereafter his conduct declined markedly for the remaining three years.

EXTRA-CURRICULAR ACTIVITIES: Mr. Wise was a varsity football and track player throughout his four years at the Academy.

---

UNITED STATES MILITARY ACADEMY

| Name | Date of Birth | Date of Entry | Date of Graduation | Date of Marriage | Academic Record: Year | Average 3.0-highest 2.0-passing | Class Standing | Grad. Rank |
|------|---------------|---------------|--------------------|--------------------|----------------------|-------------------------------|----------------|------------|
| Cadet A | | July 1946 | June 1950 | Unknown | 1st:Jul 46 June 47 | 2.3 | 685 of 764 | |
| | | | | | 2nd:Jul 47 June 48 | 2.2 | 647 of 691 | |
| | | | | | 3rd: Jul 48 June 49 | 2.2 | 668 of 675 | |
| | | | | | 4th: Jul 49 June 50 | 2.4 | 635 of 673 | 659 of 673 |

CONDUCT: satisfactory held rank of Cadet Sgt.

| Cadet B | | July 1953 | June 1957 | May 1956 | 1st: Jul 53 June 54 | ---- | --------- | |
| | | | | | 2nd: Jul 54 June 55 | ---- | --------- | |
| | | | | | 3rd: Jul 55 June 56 | 2.3 | 383 of 586 | |
| | | | | | 4th: Jul 56 June 57 | 2.2 | 460 of 567 | 402 of 567 |

CONDUCT: satisfactory

| Cadet C | | July 1960 | June 1964 | Dec.1961 | 1st: Jul 60 June 61 | 2.50 | (dean's list) | 97 of 679 |
| | | | | | 2nd: Jul 61 June 62 | 2.45 | ( " " ) | 92 of 595 |
| | | | | | 3rd: Jul 62 June 63 | 2.45 | ( " " ) | 179 of 571 |
| | | | | | 4th: Jul 63 June 64 | 2.50 | ( " " ) | 153 of 566 |
| | | | | | | | graduation rank: 120 of 566 | |

CONDUCT: satisfactory

| Cadet D | | July 1962 (class of 66) | resigned 1965 (due to marriage) | Dec.27,'63 | 1st: Jul 62 June 63 | 2.45 | (dean's list) | 92 of 663 |
| | | | | | 2nd: Jul 63 June 64 | 2.4 | | 149 of 615 |
| | | | | | 3rd: Jul 64 June 65 | 2.5 | (dean's list) | |
| | | | | | 4th (1 semester) | | | |

CONDUCT: satisfactory

Performance rating: superior (Aug. 1963)

UNITED STATES MILITARY ACADEMY

page - 2

| Name | Date of Birth | Date of Entry | Date of Graduation | Date of Marriage | Academic Record: Year | Average 3.0-highest 2.0-passing | Class Standing | Grad. Rank |
|------|---------------|---------------|--------------------|--------------------|------------------------|-------------------------------|----------------|------------|
| Cadet E | | July 1963 (class '67) | resigned Jun '67 due to marriage | Sept.3,1966 | 1st: Jul 63 June 64 | 2.47 | (dean's list) | 181 of 658 |
| | | | | | 2nd: Jul 64 June 65 | 2.47 | (dean's list) | 176 of 632 |
| | | | | | 3rd: Jul 65 June 66 | 2.35 | | 255 of 597 |
| | | | | | 4th: Jul 66 June 67 | 2.4 | (dean's list) 1 semester | 273 of 534 |

NOTE: Cadet E received credits but denied diploma and commission.  graduation rank: 211 of 584

CONDUCT: good -- reports of field officers were laudatory.

| CADET F | | July 1965 (class of 69) | resigned Sept.1968 due to marriage | Mar.23,1968 | 1st: Jul 65 June 66 | 2.25 | | 559 of 974 |
|---------|--|-------------------------|-----------------------------------|-------------|---------------------|------|--|-------------|
| | | | | | 2nd: Jul 66 June 67 | 2.45 | (dean's list 2nd sem.) | 205 of 878 |
| | | | | | 3rd: Jul 67 June 68 | 2.5 | | 188 of 816 |
| | | | | | 4th: resigned | | | |

CONDUCT: satisfactory

---

UNITED STATES COAST GUARD ACADEMY

| Name | Date of Birth | Date of Entry | Date of Graduation | Date of Marriage | Academic Record: Year | Average | Class Standing | Cumulative average |
|------|---------------|---------------|--------------------|--------------------|------------------------|---------|----------------|--------------------|
| R.K. PESCHEL | May 9,1942 | July 1959 | June 1963 | Dec.1962 | 1st: Jul 59 June 60 | C+ | | |
| | | | | | 2nd: Jul 60 June 61 | C+ | 62/131 | |
| | | | | | 3rd: Jul 61 June 62 | B- | 52/114 | |
| | | | | | 4th: Jul 62 June 63 | B- | 36/97 | B- |

CONDUCT RECORD: Unremarkable

EXTRA-CURRICULAR: On varsity soccer for four years worked on Yearbook his senior year

| PAUL PIERCE | July 31,1940 | July 1959 | June 1963 | Dec.1962 | 1st: Jul 59 June 60 | C+ | | |
|-------------|--------------|-----------|-----------|-----------|---------------------|----|--|--|
| | | | | | 2nd: Jul 60 June 61 | C+ | 83/131 | |
| | | | | | 3rd: Jul 61 June 62 | C+ | 76/114 | |
| | | | | | 4th: Jul 62 June 63 | C+ | 66/97 | C+ |

CONDUCT: Unremarkable

EXTRA-CURRICULAR: Track and sailing varsity

NOTE: It should be noted that Mr. Pierce's grades for the last two semesters of his senior year following his marriage went up substantially. However, as a counterbalance to this fact, counsel wishes to note that following Mr. Pierce's graduation he dynamited the house of his mother-in-law and father-in-law, causing their deaths.

---

UNITED STATES COAST GUARD ACADEMY

page 2

| Name | Date of Birth | Date of Entry | Date of Graduation | Date of marriage | Academic Record: Year | Average | Class Standing | Cumulative Average |
|------|---------------|---------------|--------------------|--------------------|------------------------|---------|----------------|--------------------|
| JAN SMITH | Jan.13,1942 | July '59 | June 1963 | Aug.22,1962 | 1st: Jul 59 June 60 | B- | | |
| | | | | | 2nd: Jul 60 June 61 | C+ | 44/131 | |
| | | | | | 3rd: Jul 61 June 62 | C+ | 53/114 | |
| | | | | | 4th: Jul 62 June 63 | B- | 47/97 | C+ |

CONDUCT: Unremarkable

EXTRA-CURRICULAR: Mr. Smith was a Platoon Commander for his senior year and participated in some varsity sports.

UNITED STATES NAVAL ACADEMY

| Name | Date of Birth | Date of entry | Date of Graduation | Date of Marriage | Academic Record: Year | Average (4.00 highest) | Class Standing | Conduct |
|---|---|---|---|---|---|---|---|---|
| Cadet "A" | | Jul 1961 | resigned (Jan. 25, '65) | 8/10/64 | 1st: Jul 61 June 62 | 3.25 | 193/1018 | A/B |
| Class of '65 | | | | | 2nd: Jul 62 June 63 | 3.04 | 564/905 | B |
| | | | | | 3rd: Jul 63 June 64 | 2.20 | 668/842 | C |
| | | | | | 4th: | --- | ------- | ---- |
| Cadet "B" Class of '66 | | 6/62 | resigned (10/13/65) | 8/29/63 | 1st: Jul 62 Jun 63 | 2.98 | | |
| | | | | | 2nd: Jul 63 Jun 64 | 2.55 | | |
| | | | | | 3rd: Jul 64 Jun 65 | 2.31 | | |
| | | | | | 4th: ------------------------------------------- | | | |
| Cadet "C" | | 6/62 | separated (4/21/66) | 10/1/65 | 1st: Jul 62 Jun 63 | 3.25 | | A |
| Class of '66 | | | | | 2nd: Jul 63 Jun 64 | 2.84 | | B |
| | | | | | 3rd: Jul 64 Jun 65 | 3.04 | | A |
| | | | | | 4th: Jul 65 Dec. 65 1 semester only | 3.18 | | |
| Cadet "D" | | 6/62 | separated (4/5/65) | 12/18/64 | 1st: Jul 62 Jun 63 | 3.00 | | A/C |
| Class of '66 | | | | | 2nd: Jul 63 Jun 64 | 3.25 | | A |
| | | | | | 3rd: Jul 64 Dec.64 1 semester only | 3.25 | | |
| Cadet "E" Class of '67 | | 6/63 | separated (5/6/66) | 1/28/66 | 1st: Jul 63 Jun 64 | 2.76 | | B |
| | | | | | 2nd: Jul 64 Jun 65 | 2.53 | | B |
| | | | | | 3rd: Jul 65 Dec. 65 1 semester only | 2.63 | | A/B |

[A 7871]

UNITED STATES NAVAL ACADEMY   page - 2

| Name | Date of Birth | Date of Entry | Date of Graduation | Date of Marriage | Academic Record: Year | Average (4.00 highest) | Class Standing | Conduct |
|---|---|---|---|---|---|---|---|---|
| Cadet "F" Class of '69 | | 6/65 | separated 6/14/67 | 1/1/67 | 1st: Jul 65 Jun 66 | 2.35 | | A- |
| | | | | | 2nd: Jul 66 Dec. 66 1 semester only | 2.22 | | A/C |
| Cadet "G" Class of '71 | | 6/67 | separated 7/7/71 | 8/12/68 | 1st: Jul 67 Jun 68 | 2.82 | | B‡ |
| | | | | | 2nd: Jul 68 Jun 69 | 3.35 | | B |
| | | | | | 3rd: Jul 69 Jun 70 | 3.37 | | A |
| | | | | | 4th: Jul 70 Dec 70 1 semester only | 3.22 | | A |
| Cadet "H" Class of '72 | | 6/68 | separated 11/13/70 | 5/20/70 | 1st: Jul 68 Jun 69 | 2.20 | | B‡ |
| | | | | | 2nd: Jul 69 Jun 70 | 2.80 | | A- |
| Cadet "I" Class of '73 | | 6/69 | separated (Jul 72) | 1/21/72 | 1st: Jul 69 Jun 70 | 3.27 | | B‡ |
| | | | | | 2nd: Jul 70 Jun 71 | 3.00 | | A |
| | | | | | 3rd: Jul 71 Jun 72 | 3.26 | | A |
| Cadet "J" Class of '74 | | 6/70 | separated 4/3/72 | 10/11/71 | 1st: Jul 70 Jun 71 | 2.60 | | A- |
| | | | | | 2nd: Jul 71 Dec. 71 1 semester only | 3.41 | | B |